IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

ANGELA M. WEST,            )
                           )
       Plaintiff,          )
                           )
                           )     CIV-12-976-F
v.                         )
                           )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social )
Security Administration[1], )
                           )
       Defendant.          )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, Acting Commissioner Colvin is substituted for former Commissioner Michael J. Astrue as the Defendant in this action. No further action need be taken to continue this action. 42 U.S.C. § 405(g).

decision be affirmed.

I. Background

Plaintiff protectively filed her applications in April 2010 alleging that she became unable to work on July 26, 2009, due to a "slipped disc" in her back. (TR 156). At that time, she was 50 years old. She previously worked as a chef or cook, and she had two years of college. She received unemployment benefits for a short period of time, but she stated that those benefits ended when her treating physician, Dr. Zellmer, stated that she was unable to work. (TR 183).

The record includes a form completed by Dr. Zellmer for the Oklahoma Employment Security Commission dated September 29, 2009, in which Dr. Zellmer stated that he had treated Plaintiff beginning the same date, that Plaintiff had "lumbago"[2] and "sciatica"[3] existing for 1 ½ months, that she was unable to work beginning September 29, 2009, and that she needed further evaluation to determine if she was able to work in the future. (TR 148-150).

Plaintiff stated that she experienced back and knee pain with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks (TR 167). Plaintiff's medical records reflect treatment at a hospital emergency room on

---

[2]Lumbago is simply another term for back pain or back ache. http://www.nlm.nih.gov/medlineplus.backpain.html.

[3]A symptom of a problem with the sciatic nerve which can begin in the lower back and extend down the leg to the calf, foot, or toes and generally involves only one side of the body. http://www.nlm.nih.gov/medlineplus.sciatica.html.

2

September 16, 2009, for back pain. (TR 189-190). She described episodic back pain for 14 years but worsening in the previous two weeks with pain radiating down the back of her legs to the ankles. She described pain with bending or moving but no sensory or strength changes, no trauma or heavy lifting injury, and no difficulty sleeping. The examining physician noted Plaintiff exhibited no deficits other than a vague tenderness to the paraspinous musculature of the back. She was treated conservatively with medications for lumbar radiculopathy, advised to undergo MRI testing of her lumbar spine, and advised not to lift over 10 pounds for a two-week period.

In September 2009, Plaintiff saw Dr. Zellmer, a family physician. She described constant back pain radiating to her legs resulting from a work-related back injury and hypertension for which she had "quit" taking prescribed medication. (TR 204). Dr. Zellmer noted a diagnostic assessment of lumbago, sciatica, hypertension, and incontinence, and that "conservative" treatment was prescribed until MRI testing was completed. (TR 205). Dr. Zellmer noted in October 2009 that Plaintiff complained of continued low back pain radiating to the back of her legs and weakness in both legs. She was prescribed Lortab®, a narcotic pain medication, and Flexeril®, a muscle relaxant medication. (TR 202).

At a December 2009 office visit, Plaintiff's medications were continued. Plaintiff underwent MRI testing in December 2009, and the test was interpreted as showing a mild disc bulge at one level of Plaintiff's lumbosacral spine with a "tiny" disc protrusion and degenerative changes but no central spinal canal stenosis. (TR 193). Dr. Zellmer noted in December 2009 that Plaintiff was willing to try physical therapy to reduce her back pain and

3

that she did not want strong medications. (TR 198).

In May 2010, Plaintiff complained of continuing back pain and "restless legs" and difficulty sleeping and eating. (TR 196). She requested to "restart" physical therapy, and she was referred for physical therapy for lumbago. (TR 196-197). Dr. Zellmer noted that on examination her back was tender with range of motion testing. (TR 197). In June 2010, Dr. Zellmer noted that Plaintiff complained of back pain and stated that she went to physical therapy on one occasion, that she was eating and sleeping adequately, and that she wanted to see a back specialist. (TR 194). The physician noted Plaintiff was referred for a neurosurgery evaluation for her back pain and that her back exhibited tenderness with range of motion testing. (TR 195).

In June 2010, Plaintiff underwent a consultative evaluation conducted by Dr. Brennan. (TR 206-212). After interviewing and examining Plaintiff, Dr. Brennan reported a diagnostic assessment of chronic lumbosacral myositis[4], lumbar discopathy by history, and morbid obesity. (TR 208). Notably, Dr. Brennan found that on examination Plaintiff had normal hand skills, normal posture, normal heel and toe walking, "somewhat limited" flexion movements of her spine, slight tenderness with palpation of her lumbar spine, and no evidence of radiculopathy. (TR 207). She walked with a stable and safe gait without the use of assistive devices. (TR 208).

In July 2010, Dr. Rogers, a medical consultant for the agency, reviewed the medical

---

[4]"Myositis means inflammation of the muscles that [are used] to move [a person's] body." http://www.nlm.nih.gov/medlineplus/myositis.html

4

evidence and opined that Plaintiff was capable of performing work at the light exertional level. (TR 213-220). Dr. Wainner reviewed the medical evidence and agreed with this assessment in August 2010. (TR 221).

Plaintiff was treated by another family physician, Dr. Wilson, in October 2010, November 2010, and April 2011. (TR 222-230). At her office visit in October 2010, Dr. Wilson noted Plaintiff had a history of lumbar disc bulge with a suggestion of sciatic irritation, morbid obesity probably aggravating her back condition, and uncontrolled hypertension, for which medications were prescribed.

At her next visit in November 2010, Plaintiff's hypertension medication was changed. There was no note of a complaint of or treatment for back pain. (TR 226). She was advised to lose weight. In April 2011, Plaintiff complained of lower back and knee pain that was sharp, stabbing, and persistent, but relieved with opiate medications. (TR 222). Dr. Wilson also noted Plaintiff had a history of using and selling illegal substances. (TR 222). She exhibited pain with back movements and straight-leg raise testing, and Dr. Wilson's diagnostic assessment was hypertension, morbid obesity, abnormal glucose, and bulging intervertebral disc, for which pain and blood pressure medications were prescribed.

At a hearing conducted in April 2011, Plaintiff and a vocational expert ("VE") testified. Plaintiff testified that she had not seen a surgeon although surgery had been recommended by Dr. Zellmer and that her physical therapy was "terminated because they couldn't help [her back impairment] until the surgery was done." (TR 21). Plaintiff stated that she was being treated by Dr. Wilson and that her activities were limited by back and

5

knee pain. She stated her medications made her drowsy, that watching television and "[s]leeping on the couch" were her general daily activities, that she seldom drove, and that she did no housekeeping chores. (TR 24). She also testified that her back pain was relieved only when she slept and that she used ice packs and medications to reduce her pain.

Administrative law Judge Gordon ("ALJ") issued a decision in May 2011 in which the ALJ found that Plaintiff had not worked since July 26, 2009, the date on which she alleged she became unable to work. (TR 44). Following the well-established sequential evaluation procedure, the ALJ found at step two that Plaintiff had severe impairments due to a "[s]lipped" disk and degenerative disk disease.[5] (TR 44).

Having found at step three that Plaintiff's impairments did not medically meet or equal the requirements of a listed impairment deemed disabling *per se* by the agency, see 20 C.F.R. pt. 404, subpt. P, app. 1, the ALJ found at step four that Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level.[6] Relying on the VE's testimony concerning the availability of jobs for an individual with Plaintiff's

---

[5]A "slipped disc" is a slang term referring to a herniated disk. See http://www.mayoclinic.com/health/hearniated-disk/DS00893 ("Sometimes called a slipped disk or a ruptured disk, a herniated disk occurs when some of the softer 'jelly' [of the spinal disks between the vertebrae] pushes out through a crack in the tougher exterior. . . . Most people who have a herniated disk don't need surgery to correct the problem."). It is not clear why the ALJ referred to this condition as a severe medical impairment, especially given the absence of a diagnosis of herniated disk in the medical record.

[6]Light work is defined as work involving lifting objects weighing up to 20 pounds at a time, frequently lifting or carrying objects weighing up to 10 pounds, and mostly walking or standing, or sitting with pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

vocational characteristics (age, education, and work experience) and her RFC for work, the ALJ found that Plaintiff was capable of performing her past relevant work as a chef as the job is "actually and generally performed." (TR 49). Alternatively, at step five, the ALJ found that Plaintiff could perform the jobs of short-order cook, salad maker, and food assembler. Consequently, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

## II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

III. Credibility

Plaintiff contends that the ALJ's credibility analysis is faulty. The assessment of a claimant's RFC at step four generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at * 1 (1996). "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).

Nevertheless, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in determining a claimant's credibility. SSR 96-7p, 1996 WL 374186, at * 4 (1996). In making a credibility finding, an ALJ is not required to conduct a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Credibility findings must, however, "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted). Employing "common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific evidence he [or she] relies on in evaluating the claimant's credibility." Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

The ALJ identified several reasons for discounting the credibility of Plaintiff's allegation of disabling pain and limitations. First, the ALJ summarized Plaintiff's statements concerning back pain in which she described constant back pain even with medications and

8

extremely limited daily activities due to back pain radiating to her legs as well as the side effects of her medications. However, as the ALJ noted in connection with the credibility determination, Plaintiff was taking only non-narcotic pain medications at the time of the hearing, and she had not seen a surgeon concerning possible back surgery. (TR 46, 187-188).

The ALJ also reasoned that "clinical findings [did] not substantially corroborate her subjective complaints." (TR 48). The ALJ pointed to specific medical evidence in the record, including the results of MRI testing, the report of the consultative examiner, the report of Plaintiff's one hospital emergency room visit in September 2009, and the Plaintiff's treatment records submitted by Dr. Zellmer and Dr. Wilson. These records support the ALJ's reasoning as these records do not contain findings that are consistent with Plaintiff's report of disabling pain and limitations stemming from her back impairment. The records of treatment of Plaintiff show that only conservative treatment measures were prescribed for her and that her treating physician, Dr. Wilson, cautioned her to engage in "movements such that she does not loose [sic] the muscle tone in the remaining portion of her body." (TR 230).

The ALJ further reasoned that Plaintiff had "sought very little medical treatment . . . . The record reflects significant gaps in the claimant's history of treatment. Even if the claimant cannot afford private care, treatment is available to her through emergency rooms and charitable organizations. While the claimant has availed herself of these institutions, her attendance record is spotty." (TR 48). The sparse medical record in this case supports the ALJ's finding that Plaintiff had not persistently sought medical treatment. See SSR 96-7p, 1996 WL 374186, * 7 (July 2, 1996)("[T]he individual's statements may be less credible if

the level or frequency of treatment is inconsistent with the level of complaints," although the adjudicator must first consider "any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment."). Contrary to Plaintiff's suggestion, the ALJ expressly considered Plaintiff's testimony that she lacked health insurance but accurately reasoned that the record showed she had sought treatment at a charitable medical clinic (where she received treatment from Dr. Wilson) and she still did not persistently seek medical treatment.

Finally, the ALJ noted that Plaintiff gave a history of drug and alcohol abuse and previous involvement in selling illegal substances, and the ALJ reasoned that her "credibility in connection with her drug and alcohol abuse as well as selling drugs, lends no credence to the claimant as a witness." (TR 48). The ALJ does not adequately explain why he found Plaintiff's testimony and statement less than credible in light of the one notation in the record reflecting Plaintiff gave a history of previous abuse of illegal substances and previous involvement in selling illegal substances. There was nothing in the record to show that Plaintiff had continued to use or sell illegal substances, and the ALJ erred in basing his credibility finding in part on this single notation.[7]

However, the ALJ did not rely exclusively on this reason for discounting Plaintiff's

---

[7]Defendant's argument that Plaintiff's "drug abuse supplied an alternative explanation for her pursuit of treatment" is not supported by the record. The record shows that Dr. Wilson merely advised Plaintiff that the charitable medical clinic would not provide Plaintiff with pain management services and did not indicate that Plaintiff had exhibited drug-seeking behavior, a behavior that might have provided an adequate basis for discounting her credibility. (TR 230).

10

credibility, and the ALJ's credibility finding is in other respects adequately and clearly tied to substantial evidence in the record. Hence, the record supports the ALJ's ultimate credibility conclusion that Plaintiff's statements concerning her symptoms were not fully credible to the extent they were inconsistent with the RFC assessment. Plaintiff does not challenge the RFC assessment or the step four or alternative step five findings[8], and the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ July 31st _____, 2013, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to

---

[8]Plaintiff makes only a conclusory argument in her opening brief that the ALJ should have included "postural limitations" in the RFC assessment. As this argument is not adequately supported, the argument should not be addressed. Even if the Court finds the argument is adequately supported, the claim is without merit. Plaintiff's testimony of postural limitations was not consistent with the objective medical evidence, and the ALJ's credibility finding in this regard is supported by substantial evidence in the record. Therefore, the ALJ did not err in failing to include postural limitations in the RFC assessment.

the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ___11th___ day of ___July___, 2013.

*Gary M. Purcell*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE